UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DEMAREIN B. MIMS                                    CIVIL ACTION NO. 08-cv-0670

VERSUS                                              JUDGE WALTER

WARDEN, LOUISIANA STATE                             MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Demarein B. Mims ("Petitioner") of two counts of second degree murder, and mandatory life sentences were imposed. The convictions were affirmed on direct appeal. State v. Mims, 907 So.2d 237 (La. App. 2d Cir. 2005). Petitioner later raised other claims in a state post-conviction application. It was denied. He now seeks federal habeas corpus relief. For the reasons that follow, it is recommended the petition be denied.

**Relevant Facts**

Demir Elikara and Cengiz Elikara were murdered during an armed robbery of the Rite Way Liquor Store located on Martin Luther King Drive in Shreveport. The crime was initially discovered by Judy Gibbs, who saw a black male leaving the scene as she drove into the parking lot of the store. When she entered the store, she saw 32 year-old Demir lying face-down in a pool of blood but still alive. His 68 year-old father, Cengiz, a retired auto worker who moved to Shreveport from Detroit, lay nearby, dead from a gunshot wound to

the head. Ms. Gibbs ran from the store and contacted police. An ambulance took Demir to the hospital, where he soon died.

The robbers stole approximately $3,000 from a cash register the store employees used to pay vendors, an unknown amount of money from two cash registers used to make sales to customers, several cartons of Newport cigarettes, a large plastic jar containing pennies, and a videotape of the film "My Cousin Vinny." The tape was removed from what appeared to be a video surveillance VCR system, but it was actually just a VCR used by the employees to watch movies. Cameras mounted in the store were not connected to a recording device.

There were bloody footprints on the floor of the crime scene. Two cups of ice sat on the counter, and a pint bottle of Absolut Vodka lay on the floor beside Demir. A small amount of cash and change was scattered on the floor. Police found fragments of bullet projectiles and four spent cartridges. These were matched to a .40 caliber Glock pistol that had been stolen from the trunk of a Sheriff's patrol vehicle two days before the murders.

The ice and the pint bottle of Absolut Vodka provided an initial clue that led police to a suspect. Mohammed "Mike" Rahman, Demir's business partner, testified that the store special ordered pint bottles of Absolut by the case "for one person, and that was [Petitioner's] daddy." Mr. Rahman testified that every weekday and twice a day on weekends, Petitioner's father came to Rite Way to buy a pint of Absolut. Petitioner was also a regular customer who came in "all the time" to buy cigars, cigarettes, and cups of ice.

Two days after the robbery and murders, Jerome Thomas a/k/a Doo–Doo turned himself in to police. He confessed to participating in the robbery with Petitioner. Thomas

claimed that he did not expect to kill anyone during the robbery, and he blamed Petitioner as the trigger man. Thomas had a pair of Nike shoes that made footprints consistent with the bloody footprints at the murder scene, but a positive "match" could not be made. Petitioner, age 18, turned himself in three days later, but he made no statement.

Both men were indicted on two counts of first degree murder, but the charges were later amended to second degree murder. Two trial witnesses testified regarding Petitioner's intention to commit a robbery on the day of the crimes. Robert Webb, a/k/a "Popeye," testified that he was with Petitioner and Thomas around noon on the day of the crimes, and he heard them talking about "hitting a lick," meaning a "hustle" or robbery. Tadarius Lee, who was also present, added that Petitioner and Thomas were talking about "making a hustle" because they needed some money. Lee indicated that a hustle could be anything from cutting grass to committing a robbery.

Webb testified that, later that evening, he was in a car with Monolo Baker, a/k/a "Nolo," and Lonnie Bryant. Petitioner and Thomas flagged them down and got into the car. Webb said that Petitioner and Thomas were talking about hitting a lick. Petitioner and Thomas gave Baker a couple of dollars to rent Baker's .40 caliber Glock pistol. Webb saw Baker give the Glock to Thomas. Petitioner already had a .380 caliber pistol, which he showed to Webb. Petitioner and Thomas got out of the car near Petee's, a restaurant/grocery store. Webb's group then drove a block over and spent a short time at a party. When they left the party and drove around, they encountered Petitioner and Thomas near the Home Boy Tire Center. Baker asked for the return of his Glock pistol, but Thomas said that he needed it.

Webb saw Petitioner and Thomas walk toward Rite Way Liquor, located on the other side of the tire store.

About 20 minutes later, Webb and Baker were driving past the tire store when they saw Ms. Gibbs, who discovered the victims, running across the street from the Rite Way Liquor Store. Gibbs was "hollering and crying" that someone in the liquor store was dead. Monolo Baker pulled up and said something to her, and she said, "The boy ran that way." Ms. Gibbs testified that she did not get a good look at the man's face, but Petitioner had been in her home several times to visit her nephew, and she did not see Petitioner outside the store that night.

Webb testified that he rode with Baker to Jackie Robinson Drive, where he saw Petitioner and Thomas emerging from a trail through the woods. They were wet and muddy. Baker picked them up and retrieved the Glock pistol. According to Webb, Petitioner had a sweater in his hand and a white bag of money. Thomas was carrying a jug of pennies and Newport cigarettes. Webb said that Baker got his Glock back and asked about the magazine, which Petitioner and Thomas had apparently lost, so the two men paid Baker some money for the use of the Glock and for losing the magazine. One of them said that the other gun had been thrown away or stashed. The .380 was never recovered, but police did find .380 ammunition inside a slit in Thomas's mattress. The missing Glock was the subject of media attention and an intense search by law enforcement. It was found inside a Crown Royal bag in the yard of a deputy who lived in the neighborhood where the murders happened. It held no fingerprint or DNA evidence.

Webb testified that Petitioner was upset with Thomas because Thomas had "stunned out on him." Webb explained that the expression meant that Thomas did not do what he said he would do. Thomas said nothing at the time and made no excuses, but later that evening, he made the excuse that he had "never seen anything like that happen." Webb testified that Petitioner said he "had to do it all by himself." Webb understood that to mean the robbery and the shootings. Later, at Baker's house, Webb saw Thomas counting his money, while Petitioner kept his money in the bag and left Baker's house shortly thereafter.

Thomas's girlfriend, Katrina Bailey, rode with her cousin to pick Thomas up from Baker's house. Katrina testified that Thomas was wearing "gangster Nikes," and he was carrying a Crown Royal pouch and some cigarettes. Katrina said she and Thomas went to her house to spend the night. She hid one of Thomas's shoes in a hole in her closet because it appeared to have blood on the bottom of it. Police later seized Thomas's shoes, but there was no DNA on them that matched the victims. There was blood on one shoe, but it came from a female.

Meanwhile, Petitioner and his cousin, Gransihi Mims, went to an apartment belonging to Gransihi's girlfriend, Nicole Mayberry. Mayberry's cousin, Valerie Davis, was also in the apartment. Mayberry and Davis both testified at trial. Neither had met Petitioner before that night, but they testified that he appeared to be upset. Mayberry testified that Petitioner sat on the floor of her apartment and said:

> "Doo–Doo 'f'd' up. He shouldn't have killed them people. It wasn't enough money."

This testimony was somewhat conflicting with Mayberry's earlier statement to authorities, when she described Petitioner as saying:

> "Doo–Doo 'f'd' up. We 'f'd' up. We took these people's life. It wasn't enough money."

Mayberry denied at trial that she said that to the investigator, but said that if she did it was because she had been pressured by the detectives. She also testified that she was asked to get a motel room for Petitioner, but she refused because she did not want her name on anything involving the matter. Mayberry admitted that she was high on marijuana and cocaine when the events occurred. She said that she did not see any money.

Valerie Davis testified that Petitioner sat on the floor with his money and initially said:

> "I fucked up. This money wasn't worth it. This money wasn't worth it."

Later, she said Petitioner added:

> "I killed them people. The money was not worth it."

Davis went on to say that Petitioner kept repeating "I fucked up ... It wasn't worth it." Davis testified that Petitioner had the money out on the floor during this time and that Mayberry, who testified there was no money, would have seen it. Davis estimated that it was probably about $2,000.00, and consisted of "lots of hundreds."

Davis was impeached on cross-examination by a prior statement she allegedly made to investigators that, "He didn't say he killed nobody." When confronted with this statement, Davis testified that she did not remember making the statement to the investigator. She was

also unable to recall another statement that she allegedly made to the investigator. She admitted that she used marijuana and cocaine regularly during that period, but she could not recall whether she was high at the time she made her statement to investigators.

Both Mayberry and Davis testified that Petitioner asked for a Bible while sitting on the floor, but Mayberry did not have one. Both testified that there was a discussion about Petitioner going to visit a relative in North or South Dakota. Petitioner eventually called his girlfriend, Stephanie Shorter, to come pick him up from Mayberry's apartment.

According to Davis, Petitioner and Shorter went into Mayberry's bedroom. Davis heard them talking, and Shorter was crying when they came out of the bedroom. Mayberry told Gransihi that they had to leave her apartment. Shorter testified that she did not remember much about that evening except that Petitioner said that Thomas "f'd" up. Shorter and Petitioner left Mayberry's apartment and went to Shorter's house in Bossier City.

**Sufficiency of the Evidence**

Petitioner argued on direct appeal that the evidence was not sufficient to support his convictions. He did not apply for a supervisory writ to the Supreme Court of Louisiana, but he later exhausted the claim when he presented it again through the post-conviction application process. The trial court did not address the merits of the claim. Citing La. C. Cr. P. art. 930.4(A), the court found the claim repetitive and improper for post-conviction relief because it had been fully litigated on direct appeal. Tr. 2484, 2487. The state appellate court wrote only that it had reviewed the trial court's reasons for rejecting the claims and concluded "that the trial court's reasons for denial are correct." Tr. 2698. The Supreme

Court of Louisiana denied writs without comment. Tr. 2741. The State has not urged a procedural bar defense to the federal petition based on the invocation of Article 930.4(A), and the Fifth Circuit has held that it "is not a procedural bar in the traditional sense, nor is it a decision on the merits." Bennett v. Whitley, 41 F.3d 1581, 1583 (5th Cir. 1994). Accordingly, the court will address the claim on the merits.

Petitioner was charged with second degree murder, which Louisiana law defines as the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2) when the offender is engaged in the perpetration or attempted perpetration of certain felonies such as armed robbery, "even though he has no intent to kill or to inflict great bodily harm." Armed robbery is defined in La.R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Also, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R. S. 14:24.

Mere presence at the scene of a crime does not make a person a principal to the crime, but if a murder occurs during the commission of an armed robbery, one need not possess specific intent to kill or inflict great bodily harm, nor even be the person who physically killed the victim, to be a principal to second degree murder. The risk that a crime such as armed robbery may escalate into violence and death is a foreseeable consequence of the

robbery that every party to the crime must accept no matter what he actually intended. State v. Smith, 748 So.2d 1139, 1143 (La. 1999); State v. Gaines, 2011 WL 1107155, *4 (La. App. 1st Cir. 2011). The prosecution emphasized the felony-murder theory in its closing argument, reminding the jury near the beginning and at the end that it did not matter which man did it "because they both did it." Tr. 2204, 2214.

When Petitioner raised sufficiency of the evidence on direct appeal, he emphasized that Ms. Gibbs saw only one man leaving the store that she said was not Petitioner, the only footprint at the scene linked to Thomas but not Petitioner, only Thomas was seen with the Glock pistol, and the witnesses who claimed to know of matters before and after the crimes had all implicated themselves in some way as accessories or otherwise but had not been charged with crimes. Petitioner also attacked the testimony of Valerie Davis, the only person who testified Petitioner admitted to the shooting, as incredible because of inconsistency with her prior statement, her history of drug and alcohol abuse, and her criminal record.

The state appellate court reviewed the issue at length under the appropriate standard of Jackson v. Virginia, 99 S.Ct. 2781 (1979). It found that Petitioner's role as a principal in the armed robbery was supported by evidence in the form of his own admissible statements to others that established his participation in a plan with Thomas to obtain the Glock pistol and commit an armed robbery. There was also the strong circumstantial evidence in the form of Petitioner's proximity to the crime scene with a gun immediately before and after the crimes, his possession of a bag of money, and his visible emotional distress shortly after the crime. The court found that this evidence was sufficient to support the convictions "for

second degree murder as a principal to an armed robbery in which the two victims were fatally shot, even if the fatal shots were fired by Thomas." State v. Mims, 907 So.2d at 243-45. The court also spent a great deal of time assessing the attack on Valerie Davis's testimony and found that it was within the jury's prerogative to find her credible. Id. at 245-47.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 99 S.Ct. at 2789. The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id.

The evidence was sufficient under the Jackson standard for all of the reasons assigned by the state court. Petitioner makes arguments that are the kind best presented to the jury, and it is past time for that. He also continues to attack the jury's assessment of the credibility of witnesses, but a review of the sufficiency of the evidence does not include review of the weight of the evidence or credibility of witnesses, because those determinations are the exclusive province of the jury. U.S. v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004); King v. Cain, 2011 WL 3320714, *10 (E.D. La. 2011). There was evidence, albeit sometimes circumstantial and often subject to credibility attack, which a rational person could accept as true and that would be sufficient to prove beyond a reasonable doubt that Petitioner was guilty of second degree murder. The state court's rejection of this argument

was not an unreasonable application of Jackson or other Supreme Court precedent as would be required for habeas relief under 28 U.S.C. § 2254(d).

**Jury Instruction on Principals**

Petitioner argues that the trial court improperly instructed the jury on the law of principals, which allowed the jury to find him guilty without finding that he had the specific intent to kill, and that his counsel was ineffective for failing to request a correct jury instruction. State and federal courts have reversed or vacated convictions for first degree murder (which requires specific intent to kill or to inflict great bodily harm) when a jury instruction on the law of principals, as discussed above, relieved the prosecution of its burden of proving the defendant had the requisite specific intent. See Robertson v. Cain, 324 F.3d 297 (5th Cir. 2003); Flowers v. Blackburn, 779 F.2d 1115 (5th Cir. 1986); and State v. West, 568 So.2d 1019 (La. 1990).

If the charge in this case was first degree murder or the prosecution had proceeded only under the version of second degree murder that requires specific intent to kill or inflict great bodily harm, the principal instruction might give rise to a viable argument. But in this case the prosecution also pursued a felony-murder theory of second degree murder that permits a conviction if the defendant was engaged in the perpetration or attempted perpetration of armed robbery, first-degree robbery, or simple robbery even though he has no intent to kill or inflict great bodily harm. See Jury Instructions at Tr. 2249 and Closing Arguments at Tr. 2187, 2204. The inclusion of the principal instruction was relevant to the felony-murder theory of prosecution, so the court did not err in giving the instruction, and

counsel was not ineffective for failing to object. Easter v. Warden, 2006 WL 2792413, *6 (W.D. La. 2006) (rejecting a similar claim).

**Ineffective Assistance**

Petitioner asserts a broad claim of ineffective assistance of counsel for an alleged failure of counsel "to investigate and present a viable defense." Petitioner argues that counsel should have come up with a better defense against the evidence that Petitioner was with Thomas earlier in the day, and counsel should have been able to persuade the jury that Petitioner's post-crime statements suggested not that he was guilty of murder but upset that his friend had been involved in a murder. Petitioner argues that there was no excuse for failing to pursue evidence of innocence even though counsel may have felt it would not be simple to secure. The state court rejected this claim with the observation that counsel has no control over the facts of the case, and counsel did what he could with the facts presented. The court also noted that Petitioner did not indicate what, if any, admissible evidence of innocence might exist. Tr. 2485-86.

A habeas petitioner who alleges a failure to investigate on the part of his counsel "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." Gregory v. Thaler, 601 F.3d 347, 352 (5th Cir. 2010). To prevail on an ineffective assistance claim based on uncalled witnesses, the applicant must name the witness, demonstrate that the witness would have testified, set out the contents of the proposed testimony, and show that the testimony would have been favorable. Id.

Petitioner offers nothing but conclusory assertions that more investigation, discovery, or interviews would have helped the defense. A Strickland claim asserted on habeas must be adjudicated under Section 2254(d)(1), and the petitioner must overcome the limitations of that statutory standard "on the record that was before the state court." Cullen v. Pinholster, 131 S.Ct. 1388 (2011). It is reversible error for a district court to hold a federal hearing to flesh out such a claim. Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011). Petitioner cannot meet his burden on the state court record, so this claim should also be rejected.

**Notice of Conspiracy**

The State did not call Jerome Thomas as a witness, but it sought to introduce through other witnesses statements that Thomas made about the crimes. The State argued that the testimony was admissible because L.C. E. art. 801(D)(3)(b) provides that a statement is not hearsay if it is a statement by a declarant while participating in a conspiracy to commit a crime and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established.

The State called D.A. investigator Rusty McKinley to testify about interviews he had with Robert Webb and Lonnie Bryant that indicated a conspiracy between Petitioner and Thomas to commit a robbery. Judge Garrett found that the State had established its prima facie case of a conspiracy so that the proposed witnesses could testify as to what they were told by Thomas (or Petitioner) on the date of the crimes. Tr. 1913-26.

Petitioner argues that his due process rights were violated because he was required to defend against a charge of criminal conspiracy without proper notice in an indictment, bill of information or other charge. The state court found the post-conviction application on this issue to be "completely without merit" because Petitioner was not charged with the crime of conspiracy. Tr. 2486. The undersigned is in agreement. Petitioner cites no authority whatsoever for his proposition that this use of the evidence rules required prior notice in a charging instrument. Habeas relief is not allowed unless the procedure ran afoul of clearly established Supreme Court precedent, and that is not the case.

**Crawford Issues**

Petitioner argues that the holding of Crawford v. Washington, 124 S.Ct. 1354 (2004) was violated when the trial court allowed the statements of Webb, Bryant, and Lee to be "brought before the jury in open court through the testimony of investigator Rusty McKinley." McKinley did not testify before the jury. He appeared only at a special hearing that Judge Garrett stated was "outside the presence of the jury" to determine whether the State could make its prima facie case to allow those witnesses to testify about statements made by Thomas. The judge stated twice that the hearing was conducted outside the presence of the jury, so this argument is meritless. Tr. 1913.

Petitioner then argues that the testimony by witnesses Webb, Bryant, and Lee violated Crawford when those witnesses testified as to statements made by Thomas about matters such as "hitting a lick" and negotiating to use the Glock pistol. Before Crawford, the right of confrontation was controlled by Ohio v. Roberts, 100 S.Ct. 2531 (1980), which held that

the Sixth Amendment right of the accused to "be confronted with the witnesses against him" does not bar admission of an unavailable witness's statement against a criminal defendant so long as the statement bears adequate indicia of reliability. To meet that test, Roberts required that the out-of-court statement either fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." Id. Applying that approach, Bourjaily v. U.S., 107 S.Ct. 2775 (1987) held that the co-conspirator exception to the hearsay rule was sufficiently steeped in our jurisprudence that "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of (Federal) Rule 801(d)(2)(E)." Crawford abrogated Roberts with respect to prior testimonial statements, which may not be admitted against a defendant unless he has an opportunity to cross-examine the declarant, irrespective of whether the statement falls within a firmly rooted hearsay exception or bears particularized guarantees of trustworthiness. With respect to nontestimonial statements, however, Crawford leaves in place the Roberts approach to determining admissibility. See U.S. v. Holmes, 406 F.3d 337, 347-48 (5th Cir. 2005).

Testimonial statements trigger the Confrontation Clause because it applies to "witnesses" against the accused, in other words those who bear testimony. Crawford, 124 S.Ct. at 1364. The Crawford decision did not spell out a comprehensive definition of "testimonial," but it did say that the term applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial, and to police interrogations,

which "are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Crawford, 124 S.Ct. at 1374.

The remarks that Thomas made to his friends and associates bear no resemblance to the examples given by the Court. That is why courts have held that statements in furtherance of a conspiracy are not testimonial hearsay that triggers Crawford. See U.S. v. Delgado, 401 F.3d 290, 299 (5th Cir. 2005). The Court observed in Giles v. California, 128 S.Ct. 2678, 2691, n.6 (2008) that the incriminating statements of co-conspirators were held in Bourjaily to be admissible because they were "not (as an incriminating statement in furtherance of the conspiracy would probably never be) testimonial."

Defense counsel raised a confrontation clause objection to the proposed admission of the hearsay testimony. The effect of Crawford, decided just a few months earlier, was debated. The State argued that the statements at issue were not testimonial in nature. Judge Garrett found the statements to be admissible. Tr. 1925-29. Judge Crichton rejected the claim in the post-conviction application on the grounds that the statements at issue were not testimonial, but were simply statements made to a partner in crime in furtherance of a conspiracy to commit a robbery. Tr. 2486-87. Based on the authorities cited above, the state court's adjudication of this claim was not an unreasonable application of Crawford or other clearly established Supreme Court precedent, as 28 U.S.C. § 2254(d) would require for habeas relief.

**Other Hearsay Issues**

Louisiana Code of Evidence Article 801(D)(3)(b) allows the admission of a statement by a declarant (such as Thomas) made while he was participating in a conspiracy to commit a crime "and in furtherance of the objective of the conspiracy." (Federal Rule of Evidence 801(d)(2)(E) refers to statements made by a co-conspirator "during the course and in furtherance of the conspiracy.") Petitioner contends that some of the hearsay admitted fell outside the scope of the state evidentiary rule.

Petitioner challenges two lines of evidence. The first is Webb's testimony about a discussion held after the murders concerning a lost magazine for the Glock that Thomas borrowed from Monolo Baker. The second is the post-murder statement by Thomas that he had never seen anything like that. Petitioner raised these arguments on direct appeal, arguing that the statements attributed to Thomas after the murders were committed should not have been admitted because they were not in furtherance of the objective of the conspiracy. The state appellate court applied Louisiana law, which presumes the conspiracy to continue unless or until the defendant shows his withdrawal from or termination of the conspiracy. Such actions include making a confession to the authorities as well as notifying co-conspirators of abandonment or withdrawal. Petitioner did not take such action. The appellate court found that the conspiracy continued even after the murders had been committed because Thomas and Petitioner continued to work in concert to dispose of the weapon, return the murder weapon to Baker, divide the money, and possibly plan to leave the area. State v. Mims, 907 So.2d at 248-49.

The state court is the final authority on the question of whether, as a matter of state evidence law, the statements fit within the exception to the hearsay rule for statements of co-conspirators. Fratta v. Quarterman, 536 F.3d 485, 503 (5th Cir. 2008). Petitioner also framed his argument, at least in his post-conviction application, in terms of his right to confront witnesses against him. The state court's characterization of the statements for purposes of state evidence law does not resolve the Confrontation Clause issue. The question is whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes, which is a question of federal law. Id. at 503-04.

The challenged statements were admitted during Robert Webb's testimony. He was in the car that Petitioner and Thomas got in when they emerged from a path in the woods shortly after the crime. Webb said the men were carrying a bag of money, a jug, and Newport cigarettes. Webb was asked if there was a discussion among Petitioner and Thomas with Monolo Baker about a lost magazine. Webb answered that when the men got to the house and the Glock was returned to Baker, Baker asked about the magazine. Webb said, "they lost the clip, or whatever." He recalled that, "they gave him some money, or something" to make up for it. Tr. 1952. This testimony did not include any particular statements by Thomas. Petitioner himself appears to have participated in the conversation, and his "own statement" was certainly admissible against him under L.C.E. 801(D)(2). See U.S. v. Simmons, 374 F.3d 313, 321 (5th Cir. 2004) (defendant's own statements made while talking to government witnesses were admissible under the similar federal rule, and the witnesses' portions of the conversations were necessary context). The discussion also seems

Page 18 of 20

to fall fairly within the co-conspirators exception as it dealt with financial arrangements regarding the murder weapon that were discussed immediately after the murders.

Furthermore, Confrontation Clause violations are subject to harmless error analysis. Fratta, 536 F.3d at 507-08. Habeas petitioners are not entitled to relief on such a claim unless they can establish that an error had substantial and injurious effect or influence in determining the jury's verdict. Id. The discussion about the lost magazine and financial arrangements were relevant, but they were not necessary to establish any element of the crimes. The discussion was brought out as part of the overall description of the events that night, but it had no particular importance to the prosecution's case. Even if it was admitted erroneously, the error would be harmless.

The other challenged statement also arose during Webb's testimony. Webb recounted how Petitioner said Thomas "stunned out on him and did not do what he was supposed to do." Thomas did not say anything at the time, but Webb said that later that evening Thomas made an excuse. "Well, he told me he got scared; he hadn't never seen nothing like that happen, or whatever." Webb also said Petitioner said he had to do it all by himself. Tr. 1953. Thomas's statement that he got scared is arguably outside the requirement that it be made in furtherance of the conspiracy. But its admission, if erroneous, would also constitute harmless error. Thomas saying that he had never seen anything like that did nothing to implicate Petitioner in a crime. On the other hand, Petitioner's own statement to Webb that he had to do it all by himself was powerful and plainly admissible evidence against Petitioner. Habeas relief is not available on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of August, 2011.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE